DISTRICT COURT.                                    APRIL 28, 1860.
                        ADMIRALTY.

## THE CANAL BOAT HEHN v. THE STEAMER ANTHRACITE.

Where the remote cause of collision between two vessels was an improvident deviation from the track by one of them, the vessel so deviating is alone liable for the injury which may result, even if, in the confusion produced by the deviation, error be committed by the other vessel and it participates in the immediate cause of injury.

This was a cause of collision.

## CADWALADER, J.

The libel is at the suit of the owner of the canal boat Hehn, and her cargo, to recover the loss by a collision which caused her to sink in the river Delaware nearly opposite to Willow street in the City of Philadelphia on 8th October, 1859. At the time of the collision, she was in tow of a small propeller steam tug. This tug had in tow four canal boats, one lashed to each side of her, the other two astern, fastened together in the usual mode. The tug was proceeding with her tows from Vine street up the river to Poplar street, a distance of about 2,500 feet. Willow street, at the river, is distant about 1,100 feet northward from Vine street. The tows astern were heavily laden, and of unequal lengths. They were attached, each, to the tug, by a hawser of about eighteen fathoms in length. Of these two canal boats, the one on the western, or Pennsylvania side, was the Hehn. There does not appear to have been anything improper in the arrangement of the tug and her tows.

The collision occurred at mid-day, where nothing obstructed a view of the river. It was flood tide, with a light wind from the westward of south. Nearly opposite Willow street a sloop was anchored heading down the stream, her bow distant, perhaps, fifty or sixty yards from the shore, her stern a few feet further out in the river. Her position, with reference to the moving vessels, will determine the questions which are to be decided. Shortly before the collision, her captain had extended a line from her to the shore, or to a vessel moored at the wharf.

Neither the velocity of the tug nor her direction up the river appears to have been changed until after she had herself passed the sloop.

This direction would have taken the tug, with her tows, outside of the sloop as near to her as they could have passed her safely. To determine their direction, we must, first ascertain, if possible, the distance at which the tug herself passed the sloop. This distance, though not precisely deter-

minable, may be ascertained with sufficient precision for the purposes of the cause.

Twelve witnesses have deposed as to the distance. If we take an average from the testimony of all of them, it was not quite fifty feet. But it may be better ascertained by weighing the testimony instead of thus counting the witnesses. Three of them were in the colliding vessel whose relative position will be explained hereafter. One witness, who was in a small oyster row boat, another who was in a small sail boat, the steersman of the Hehn, the captain of the other tow astern, and a man who was in the canal boat on the Pennsylvania side of the tug, have also been examined on this point. The average of the statements of the distance by these eight persons is almost fifty-five feet, varying however, from twenty-five to seventy-five or ninety feet. None of them, except the last mentioned witness, had, so far as we can determine, an opportunity for accurate observation of the particular space to be measured by the eye; and this witness was not engaged in the performance of any duty requiring particular observation on his part. This remark is important, because his account of the distance would make it greater than that of any other witness in the cause; and if his attention had been particularly directed to it, his opportunity of observing it would seen to have been such as to entitle his testimony to at least equal consideration with that of any of the four witnesses whose evidence remains to be considered. One of these four witnesses, the captain of the sloop at anchor, states the distance as between thirty and forty feet. The other three were on board of the tug herself. One of them, a deck hand, also states the distance as between thirty and forty feet; another, her engineer, at first said that it was two or three times her width, which he thought sixteen feet, but we know from other testimony to have been fourteen and one-half feet. He stated afterwards that there was from twenty-five to thirty feet *clear space* between the *stern* of the sloop and the outside of the boat lashed to the tug. There is no dispute that the stern

of the sloop had such an outward projection as to be some-
what nearer than her bow to the tug. The other witness,
the captain of the tug, deposes that the space was within
twenty feet.

The difficulty in measuring, by the eye, distances of ob-
jects moving upon the water is known from familiar experi-
ence. But, the testimony of the last mentioned five witnesses
was not embarrassed in the same degree as that of the other
seven, by this difficulty. The general result of the evidence
is that the smallest measures of the distance in question are
those of the witnesses whose duty to observe it, and means
of observation, were greatest.

Whatever allowance may be proper for the captain of the
tug's liability to partial mistake, it is difficult to believe that
the distance between the outside of the canal boat at his
inner side, and the stern of the sloop can have exceeded
thirty, or at the utmost, thirty-five feet. It may, probably,
not have exceeded twenty-five feet, and, perhaps, may not
have been so great. But, if it had been fifty feet, I think
that, in view of the relative position of the tows astern, which
will next be considered, the difference would not influence
the result of the controversy.

Until a few seconds before the collision, the line of mo-
tion of the tows astern had been a little nearer to the Penn-
sylvania shore than the wake of the tug. If no deviation
from this line had occurred, they would probably have
passed the sloop, a few feet nearer than the tug had passed
her, but not so near as to be in danger of touching. In gen-
eral, a tug and her tow astern should be so navigated as to
keep the tow near to the wake of the tug. With a single
vessel in tow, frequent small oscillations of the tow and
occasional greater divergencies, occur unavoidably when two
vessels are in tow, the liability to diverge may be increased.
The necessity to lash them together shows that this must
be more or less the case. Unless their helms are worked in
precise unison, some divergency must occur. The liability
to it is increased if their bulk or weight is unequal, or if, as

in this case, they are of different lengths. A free steamer meeting a steam tug thus incumbered with tows must keep out of their way. Towage, which is an important part of navigation, could not be safely carried on under any different rule. On the other hand, persons concerned in towage must not occupy so much space as to obstruct unnecessarily those avenues of navigation which they unavoidably more or less incumber. In both respects, regard is due to the particular exigencies of their navigation which prevent the tow from being always in wake. A small tug, with tows astern, approaching a vessel at anchor so as to pass her at a distance of less than fifty feet, cannot, under ordinary circumstances, expect any vessel having a free choice of direction to pass between herself and the vessel at anchor. In such a case it may be the duty of the navigator of the tug to consider the unavoidable tendency of her tows to diverge from their course, his duty may require him to prevent this tendency from carrying them out of her direction in any such manner as to increase the width of the whole space occupied.

To prevent their divergencies from increasing this width he may sometimes very properly keep them upon a line inside of her wake so as to bring them somewhat nearer to the vessel at anchor.

If this can be done safely with reference to the vessel at anchor, it may be the best course of navigation in all other respects. In the present case, the tug was to pass the sloop with so small an intervening space that no other vessel could have been expected to pass, of choice, between them. If she had allowed her tows to diverge outwardly to a greater than her own intended distance from the sloop they might, with herself, have occupied more than a fair portion of the river. This was prevented by keeping them a little inside of her wake. To this relative position of the tows, no other vessel in the river than the one at anchor could object; nor could she object if they were not brought in dangerous proximity to her. The conclusion which I deduce from the testimony is, that the tug passed the sloop at a proper dis-

tance of between twenty and forty feet and that, if the approach of the colliding vessel had not occurred the tows would have passed the sloop somewhat, but probably not much, nearer. Their hawsers were tight, and they would have sufficiently obeyed their helms to admit of some regulation of the distance at the time of passing.

The colliding vessel, the steamer Anthracite, was a small freighting propeller twenty-three feet in width, of the burden of one hundred and twenty tons; she was coming down the river, and until she approached the sloop at anchor, was in a direction which would have taken here between the sloop and the city wharves. The captain of the Anthracite was at her helm. In approaching the sloop he perceived her line out across his intended course, and, therefore, changed his intention of passing her on that side. In altering his direction, he inclined gradually outward, intending to take a new direction parallel to his former course, and not farther from it than would enable him to clear the sloop on her outer side. He thinks that the first slight variation of his course occurred when he was about five hundred feet from her. He changed it so gradually that when only about twenty feet from her, he appeared when looked at from her deck, to be *rounding her stern*. So her captain testifies; the captain of the Anthracite says that he discovered the tug when he first altered his course. He then formed and executed the intention to pass between the sloop and the tug. He did not observe the tows astern until too late for any change of this purpose.

The speed of the approaching vessels is variously stated by the witnesses. The sum of the velocities in opposite directions cannot have been less, I think, than six miles in an hour. If so, the length of a tightly-stretched eighteen fathom hawser would have been passed in ten seconds. The tug, before the Anthracite passed her bow, had passed the sloop. The Anthracite would, therefore, have cleared them, although there had not been sufficient space between them for the purpose when they were opposite to each other. But, while the

space for passing the tug was thus enlarged, a part of the ten seconds was consumed. There was a corresponding contraction of the space in which the tows astern and the Antracite were advancing to meet each other.

As a propeller, she would obey promptly her helm. But, in the space which remained, no change of helm would have enabled her by anything short of a miracle, to have cleared the tows. The conduct of all parties proves that, from every direction, a collision appeared to be inevitable, though, as usually happens, persons who saw only the last stages of the unfortunate occurrence entertained erroneous impressions as to its cause.

The cause of the collision was the manœuvre of the captain of the Anthracite in attempting to pass between the sloop and the tug. Had the tug been without any tows astern, the relative positions and velocities were such that he would have succeeded in the attempt. But, it by no means follows that the attempt would not have been culpably perilous, though there had not been any tow astern. From his position, he was not able to measure accurately with his eye the distances of moving objects ahead. His testimony is loose and inaccurate as to distances in the line of approach where a very small difference might have brought him into collision with either the tug or the sloop. In the transverse distances he was not less liable to mistake. He thought that the distance of the tug from the sloop in passing her was about seventy-five feet. One of his hands thought so likewise. But his mate thought this distance fifty feet. The captain of the sloop thought it thirty or forty feet, and the captain of the tug, as we have seen, says that it was only twenty feet. Where human life, to say nothing of property, was at risk, such differences were extremely critical in a case in which, though his impressions had even been accurate, certainty was impossible. But, this point is not material, as the cause must be decided with reference to the actual fact that the tows were astern.

The captain of the Anthracite cannot be justified, or excused, for taking his course in the new direction without having seen the tows. He might have stopped his vessel until he saw whether the way was clear, or might have passed farther out into the river where the channel seems to have been clear. But, he could not properly advance in a new direction without seeing that his track would be unobstructed. Every navigator, in taking an optional new course, is bound always to look out beforehand for everything that may be encountered in the new direction. This navigator ought, more especially, to have looked out for such tows as are usually astern of such a tug as he actually saw ahead and advancing. His vessel is responsible, therefore, in precisely the same degree and mode as if he had actually seen the tows. If he had seen them, he could not have been morally or legally excused for laying his course in the direction which he took. Had the sloop not been there, he would have been bound to keep out of the way of the tug and her tows, not merely because the tug was an *incumbered* and his own a *free* vessel, but also because he was changing his own course. But the fact that the sloop was a fixed obstacle with reference to whose position his course was to be changed renders the definition of his duty more precise. We are to suppose him to have seen the tows. Had he done so, he would have seen that they were inside of the tug's wake. He was bound to know that they might probably be inside of it, and that, if not already inside, they were liable at any-time to a divergency in this direction. Without entering thus minutely into particulars, it suffices to say that this tug, having tows astern, was herself so near to the sloop as to have, on the Jersey side of the sloop, not only the actual, but the *apparent inner* track. Therefore, the captain of the Anthracite, when he attempted to pass in this track between the sloop and the tug, violated the rule of navigation, and rendered his vessel answerable for any damage to the tug, or tows, which this unauthorized movement might cause.

Persons who were in the tug depose that for some time after they first became aware of the intention of the navigator of the Anthracite to pass outside of the sloop, they supposed that he intended to pass outside also of the tug and her tows. We may assume that the persons in the tows astern likewise had at first this belief. They had a right so to believe, because it was his duty to pass on their outside. He could not complain that they acted on the belief that he would, in this respect, observe the rule of navigation. These persons in the tows, as their danger was greatest, were naturally the first who discovered that he really was on the inner track and must run them down. The captain of the tow astern which was on the outer side, on making the discovery, seems, probably in some alarm, to have taken the place of the steersman who, until then, had been at her helm. The hawsers were then taut, and the tows had been steered without any previous deviation from their track which has been described. At this time, the captain of the outer tow, concurrently with the helmsman of the Hehn, made a movement which was intended to avoid, if possible, the approaching danger. What precisely they intended to do for this purpose, does not appear. The effect of what they did, appears to have been to bring the tows nearer to the Pennsylvania shore. Some of the witnesses describe the inclination as a slight sheer towards the sloop. Upon this movement of the tows, they were first discovered by the captain of the Anthracite. He immediately threw off two-thirds of her head of steam. He could not then have changed his direction, because it would have been too late to attempt to proceed outwardly across the tug's bow. A collision with her would have been more dangerous than with the tows. In the meantime, the tug had pursued her course, her captain unaware of the danger until she had passed the stern of the sloop and was, perhaps, nearly opposite the bow of the Anthracite.

The course of the Anthracite was then, for the first time, perceived by the captain of the tug, who, when ten or

fifteen feet beyond the stern of the sloop, gave the signal to stop the engine of the tug, which was obeyed by her engineer.    The captain of the tug, speaking of the Anthracite, says, "I saw then that she was going to try to go between me and the sloop, and I stopped the tug, knowing that she (the Anthracite) had not room to get through between my tow and the sloop."    No sooner was the engine of the tug stopped than the Anthracite was abreast of her.    The danger, if there had been any, of a collision between them, was over.    The captain of the Anthracite then stopped and backed her engine.    In the meantime, when the tug's engine had been stopped, her hawsers which held the tows were slackened as her speed was checked, and, according to the testimony, dropped into the water.    When the resistance of the hawsers ceased the former slight sheer of the tows towards the sloop was changed into a more decided inclination, which the witnesses call a *rank* sheer towards her.    The helms of the tows were with difficulty changed in time to prevent the Hehn from running into the sloop.    They were at one time very few feet apart.    In the meanwhile, the Anthracite, notwithstanding the backing of her engine, had been borne forward by her previous headway, and struck the Hehn, so that she sank in a few minutes.

Testimony which, standing alone, might have induced a belief that one or both of the tows astern had no helmsman at his post is conclusively contradicted.    A steersman was constantly at the helm of each of them.    As is frequently the case with such craft, the steersman of each of them was an inexperienced person.    The proper inquiries, however, are not as to the skill of the boatmen as navigators, or their want of it, but as to their acts or omissions.    If, however, their general skill were, for any reason, material, the fact would appear to be that before anything which has been thought questionable occurred, the captain of one of the tows had himself taken his own helm, and assumed the direction of the steersman at the helm of the other.

It has been argued that a mistake occurred on the part of

the boatmen in bringing the tows nearer to the sloop, and thus narrowing the space through which the Anthracite was to pass. Much of the testimony of the nautical witnesses on the subject is of little or no importance, as they did not know that the increase of the sheer just before the collision was consequent upon the relaxation of the tension of the hawsers when the progress of the tug was checked. But the steersmen of the tows had previously given to them an inclination in this direction without which the tendency which caused the sheer would, perhaps, not have existed. The argument has assumed, therefore, that, if the tows had been properly steered they might have cleared the Anthracite.

If this argument were available for any purpose, it would not, in a Court of Admiralty, exonerate the Anthracite for having improperly taken the inner track. The utmost effect of the argument would be to induce the court to divide the loss, according to the admiralty rule, equally between the tow and the Anthracite.

The testimony shows, however, as I think, that a collision could not have been escaped by any measure that could have been executed on board of the tows. I very much doubt if those who managed them at the crisis of peril erred in judgment in bringing them closer to the sloop.

The Anthracite was in the wrong track, she would readily obey her helm, as has been stated. Her proper position being in an outer track, the most prudent course may, perhaps, have been to give her, until the latest moment, an opportunity to pass, if possible, outside. To run in towards the sloop, would not cross the proper track of the Anthracite, and might, perhaps, afford her such an opportunity to get into this track.

At such a crisis, any movement made under an assumption that a free steamer, or perhaps any other free vessel, in a wrong course, will continue in it, is almost always more dangerous than a movement which may tend possibly to enable her to correct her mistake. But the case, under this head,

may be disposed of without any decision as to the wisdom, or inexpediency, of this movement.

The general result of the evidence is that the only changes of direction or position of the tows which occurred brought them *nearer* to the sloop. Now, until their navigators perceived that the Anthracite was not going to pass outside of them, the nearer they came to the sloop, the greater, as has been explained, was the space, in the proper quarter, for the Anthracite to pass. When they perceived that she was not in her proper track, and that she was moving in a direction which would bring her between them and the sloop, they were at a crisis of such peril that, if, in their alarm and confusion they made any blunder, they were not responsible to the party who caused the peril, either for the blunder or for its consequences; that such a period is one of exemption from responsibility for errors of judgment thus caused is familiar doctrine in courts of admiralty. Fearless wisdom in the conduct of persons thus in peril cannot be required for the protection of a party in the wrong from the consequences of his own fault.

Therefore, without deciding whether an error of judgment, in this respect, occurred in the time of danger or not, I do not think the case a proper one for a division of the loss between the colliding vessels. The Anthracite is, I think, wholly responsible for having determined her course in the new direction, without having seen the tows and kept out of their track.

My only doubt under this head has arisen from the testimony of the witness Welsh, who was in the canal boat on the inner side of the tug. He deposes that the space between the outside of this boat and the sloop in passing her was twenty-five or thirty *yards*, thus apparently confirming the two witnesses in the Anthracite who have deposed that the distance was about seventy-five feet.

In view of the small width of the Anthracite, and less width of other craft in the river, I should have thought that if the clear intervening space had exceeded fifty feet, it should perhaps have been kept clear for the passage of such craft.

In that case, the plan adopted of keeping the tows which were astern inside of the wake of the tug might have been improper, such a fault in their navigation would not have excused the fault of the captain of the Anthracite in passing into their track, as he did, without even seeing them; but it might have induced a division of the loss. I am not at liberty to conjecture that the witness Welsh when he mentioned *yards* may have intended to say *feet*. I hesitated, however, whether I would not express a desire that he should be re-examined in court in order that his meaning might be precisely known, and that his capacity thus to measure such a distance might be tested by some standard with which it could be compared.

But this course would perhaps have occasioned such delay as to prevent the hearing of an appeal from the court's decision until after the present spring. For the reasons which have been stated in the early part of this opinion, I think that there is a decided preponderance of evidence against the testimony of these three witnesses as to the distance in question. I therefore do not defer my decision on this account.

Decree for libellant with costs.

On appeal to the Circuit Court, Judge Grier held that the cause of the disaster, as appeared to him from the evidence, was directly participated in by the negligent or unskilful steering of the canal boat. The case was, therefore, referred to the clerk, as commissioner, to report the amount of damage, if any, to the propeller. That to the tow had been previously ascertained.

In his opinion he questions the applicability to the case of the rule that a free steamer meeting a tug encumbered by tows must keep out of the way, and cites New York, etc., *v.* Philadelphia, etc., 22 Howard, 472, where the existence of the rule is denied altogether. Admitting its existence, however, he does not understand that those in charge of such boats are absolved from the ordinary duties of navigation, but rather that their vigilance should be augmented in proportion to the embarrassments they have to encounter.